IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| WIS-Bay City, LLC, | Case No. 3:08 CV 1730 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Bay City Partners, LLC, | |
| Defendant. | |

This matter is before the Court on cross Motions for Partial Summary Judgment by Plaintiff WIS-Bay City, LLC ("WIS-Bay") (Doc. Nos. 25-26) and Defendant Bay City Partners, LLC ("Bay City") (Doc. No. 16). The Motions ask the Court to decide the following issues: (1) whether a clause in the Operating Agreement precludes Bay City from bringing its Counterclaims; (2) whether Ohio law or Texas law applies to the terms of the Cognovit Note; and (3) whether a clause in the Cognovit Note containing a $4 million late payment penalty is unenforceable under applicable state law. These issues have been fully briefed by the parties.

## I. BACKGROUND

In spring 2007, Bay City was the sole owner, member, and manager of Port Assets, LLC, a limited liability company which owned a gasification plant in Bay City, Texas. The gasification plant was designed to convert chlorinated oil waste from refineries into synthetic gas, hydrochloric acid, and sand. Built in approximately 1998, the gasification plant was fully equipped for its intended operation, but it never opened. Port Assets wished to rehabilitate the plant to make it operational.

In spring 2007, Port Assets arranged for $60 million in permanent financing of the gasification plant from another company. However, Port Assets needed an interim loan of $9 million to pay off existing debt in order to obtain the permanent financing. In April 2007, a representative from Bay City approached Lloyd Williams, president of Williams Industrial Services, LLC, for this loan. Williams agreed to make the loan on behalf of WIS-Bay City, LLC, a yet-to-be-formed limited liability company. A "Term Sheet for Investment in Bay City Gasification Facility" was thereafter executed by Port Assets, Bay City, and WIS-Bay (Doc. No. 16, Dopp Aff., Ex. 1).

As a condition precedent to making the $9 million loan, Williams insisted that Port Assets convey the gasification plant to Gulfstream Fuels, LLC ("Gulfstream"), another newly formed entity to be used in the reorganization of Port Assets. The transaction timely closed on May 4, 2007 in Bay City, Texas. At the closing, Bay City and WIS-Bay entered into a Limited Liability Company Operating Agreement ("Operating Agreement") forming Gulfstream (Doc. No. 1, Ex. A).

Under the Operating Agreement, WIS-Bay received 40% ownership of Gulfstream in the form of preferred units, in addition to 100% control of Gulfstream until repayment of the $9 million loan from WIS-Bay to Gulfstream (*id.* § 2.1). At the closing, Bay City (on behalf of Port Assets) signed a Warranty Deed with Vendor's Lien conveying the gasification plant to Gulfstream (Doc. No. 16, Ex. 4). Also at the closing, Williams, as the president of Gulfstream, signed the $9 million Cognovit Promissory Note (Doc. No. 4, Ex. A) ("Note"), as well as the Security Agreement (Doc. No. 4, Ex. C) and the Deed of Trust securing the Note (Doc. No. 4, Ex. D).

The Term Sheet reveals that the parties contemplated that permanent financing in the amount of $60 million would be advanced to Gulfstream on or about June 6, 2007. However, this loan failed to occur. The Note matured on July 15, 2007. Paragraph 8 of the Note provided that if Bay City

failed to close on the $60 million project financing, "the amount of principal then due shall be extended to $13 million [$9 million plus $4 million]."

In May 2008, WIS-Bay sent Bay City a Memo demanding payment of $18,942,722.27 on the Note (Doc. No. 4, Ex. B). In addition to interest and other fees related to the $9 million loan, the figure included the capitalized $4 million "late payment penalty," making the default principal $13 million.

In June 2008, Bay City filed suit against WIS-Bay in Texas state court, complaining that the terms of the Note were usurious under Texas law, and further asking the court enter declaratory judgment under the Note and enjoin the sale of the gasification plant by WIS-Bay. The Texas court entered a temporary restraining order preventing WIS-Bay from collecting usurious interest on the Note, selling the gasification plant, or taking a judgment on the Note. Unbeknownst to Bay City, WIS-Bay sold the gasification plant prior to the entry of the temporary restraining order.

In July 2008, WIS-Bay filed the instant suit in this Court, claiming Bay City breached the Operating Agreement by instituting the Texas litigation and asking this Court to find the terms of the Operating Agreement valid and binding on Bay City and issue an injunction barring Bay City from instituting any action in law or equity in violation of the Operating Agreement (Doc. No. 1). Bay City then consolidated the actions, bringing its Texas claims in the form of counterclaims (breach of fiduciary duty and violation of Texas usury laws) in this Court and dismissing the Texas action without prejudice (Doc. No. 4). Bay City further asks for declaratory relief, asking this Court to declare Section 2.1 of the Operating Agreement null and void and, finally, asks this Court to find that, even if Ohio law applies, the $4 million late payment penalty is unenforceable (Doc. No. 29).

3

## II.   STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Here, the critical facts are not in dispute. Rather, the parties dispute the legal significance of several terms in the Operating Agreement.

## III.   DISCUSSION

### A.   **Enforceability of Section 2.1 of the Operating Agreement**

Section 2.1 of the Operating Agreement provides for the issuance of 1,000 membership units, divided into two separate classes: "preferred units" and "common units." Bay City was issued 600 common units; WIS-Bay was issued 400 preferred units. Section 2.1 also provides that as long as at least one preferred unit is outstanding, the common unit holder (Bay City) "shall not have a right to vote, manage the affairs, or be paid, vote as a Member of the Board of Managers, or otherwise exercise any rights as a holder of Common Units or as a Member of the Board of Managers" (Doc. No. 1, Ex. A, § 2.1).

Furthermore, Section 2.1 states that so long as at least one preferred unit is outstanding, the holders of the common units (Bay City):

4

>shall not undertake to challenge the actions of the holders of Preferred Units. They do not have standing and shall not initiate any action in law or equity to challenge, enjoin, file for protection under federal bankruptcy laws, or in any way inhibit the actions of the holders of Preferred Units which are consistent with the Preferred Unit holders' actions to pay in whole, the Interim Credit Facility.

WIS-Bay argues these terms of the Operating Agreement are binding on Bay City and preclude its Counterclaims. Bay City counters that this Section is unenforceable. To determine the enforceability, the Court must first determine what law governs the Operating Agreement.

A federal court sitting in diversity must apply the substantive law, including choice-of-law rules, of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (*citing Erie R.R. v. Tompkins*, 304 U.S. 64, 74-77 (1938)). Generally, Ohio courts will honor a choice-of-law clause selected by parties to a contract. *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*, 6 Ohio St. 3d 436, 438-39 (1983). Section 10.2 of the Operating Agreement provides that "the laws of the State of Ohio shall govern all issues and questions concerning the relative rights and obligations of the Company and its Members." Therefore, Ohio law applies to determine the enforceability of Section 2.1 of the Operating Agreement.

The courts in Ohio are created by virtue of the constitution and "inhere in our body politic as a necessary part of our system of government and it is not competent for anyone, by contract or otherwise, to deprive himself of their protection. The right to appeal to the courts for the redress of wrongs is one of those rights which is in its nature under the constitution, inalienable, and cannot be thrown off, or bargained away." *Baltimore & Ohio R.R. Co. v. Stankard*, 56 Ohio St. 224, 232 (1897). In *Myers v. Jenkins*, 63 Ohio St. 101, 102 (1900), the Ohio Supreme Court held that a party to a contract could not waive his or her right to sue for breach in advance of such breach. An agreement between two private parties to divest a court of subject matter jurisdiction "is, of course, void."

5

*Bowling v. Ohio Real Estate Comm'n*, 91 Ohio App. 3d 746, 749 (1993) (*citing Myers*, 63 Ohio St. at syllabus). The Sixth Circuit has acknowledged that under Ohio law, "contracting parties cannot oust the power . . . of a court." *Forbes v. Wilson*, 243 F. 264, 267 (6th Cir. 1917) (*citing Stankard*, 56 Ohio St. at 232).

WIS-Bay does not dispute that parties cannot contract to divest a court of its jurisdiction in advance of breach. Instead, WIS-Bay argues that Section 2.1 is not an absolute bar of the right to sue on the Operating Agreement, but simply dictates the timing for filing suit. "[A]fter [Bay City] satisfies its obligations, [Bay City] is free to bring legal actions challenging what was done" (Doc. No. 26, pp. 8-9).

However, the Court finds the obligation to pay in full before Bay City can ask a court to define its obligation to pay is effectively a bar to suit and unenforceable under Ohio law. Section 2.1 goes beyond establishing a mere delay. It enables WIS-Bay to unilaterally interpret the Note, as well as other agreements, and Bay City's obligations under them, without Bay City seeking legal redress.

WIS-Bay directs the Court to *Ryan's Family Steakhouse, Inc. v. Simmons Sign Co.*, No. 1-99-77, 2000 WL 123796 (Ohio Ct. App. Feb. 2, 2000) in support of its position. That case, however, presented facts inapposite to those here. In *Ryan's Family*, plaintiff and defendants entered into a contract for defendants to furnish and install a sign with neon border lighting on a newly constructed restaurant. *Id.* at *1. The neon lighting caused a fire which destroyed a portion of the restaurant. *Id.* A section of the contract for the sale and installation of the sign provided:

> After installation is completed by [defendants], [plaintiff] assumes all liability with regard to the sign installation by [defendants] including all liability (public or otherwise) for damages caused by the sign or by reason of it being on or attached to the premises.

6

*Id.* at *2. The court affirmed the trial court's holding that the exculpatory clause precluded defendants' liability to plaintiff for the fire damage. *Id.*

The court's analysis in *Ryan's Family* is inapplicable to the clause in Section 2.1 because the exculpatory clause in *Ryan's Family* did not prohibit a party from seeking redress from the courts on the contract. The exculpatory clause merely defined and limited defendants' liability.

Because Section 2.1 is unenforceable under Ohio law, this Court has jurisdiction to hear Bay City's Counterclaims.

### B. Law Applied to Cognovit Note

Bay City contends the Court must apply Texas law (which defines and prohibits usury) to determine whether the terms of the Note are enforceable. WIS-Bay argues the Court must apply Ohio law (which does not have a usury prohibition).

At the closing, Williams, as president of Gulfstream, signed the $9 million Note, as well as two documents securing the Note -- the Security Agreement and the Deed of Trust. Paragraph 21 of the Note (Doc. No. 4, Ex. A) reads:

> 21. <u>Governing Law</u>. This Note is made at Sylvania, Ohio, and shall be construed under the laws of the State of Ohio. Loan proceeds originated in the State of Ohio.

The parties chose not to apply Ohio law for all the documents signed at the closing. Instead, Texas law governed the terms of the Security Agreement and Deed of Trust securing the $9 million loan. Section F of the Security Agreement (Doc. No. 4, Ex. C) provides:

> 6. This agreement will be construed according to Texas law, without regard to choice-of-law rules in any jurisdiction. This agreement is to be performed in the county of Secured Party's Mailing Address.

7

> 7. Interest on the Obligation secured by this agreement will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law.

Bay City construes "under law" in Section F(7) to mean "under Texas law," although the statement is not so qualified. WIS-Bay argues that Section F(7) "is a statement that the parties' agreement shall accord with the laws of usury, not a statement as to which state's law of usury will apply to govern the matter" (Doc. No. 26, p. 24).

To support its argument that Texas law applies, Bay City maintains that this Court must read the Note, the Security Agreement, and Deed of Trust together. That is true. *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 361 (1997) ("[A] writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole."). Another rule of contract interpretation is that courts "'should give effect, if possible to every provision therein.'" *Id.* at 362 (*quoting Farmers Nat'l Bank v. Delaware Ins. Co.*, 83 Ohio St. 309, syllabus ¶ 6 (1911)). Thus, the Court endeavors to give effect to choice-of-law clauses in both the Note and the Security Agreement.

Bay City argues that the choice-of-law selection in the Security Agreement prevails over that in the Note because the first paragraph of the Note incorporates the Security Agreement and Deed of Trust, effectively modifying the Note's choice of law. The first paragraph of the Note (Doc. No. 4, Ex. A) provides:

> Gulfstream Fuels, LLC (the "Borrower") . . . promises to pay to: WIS-Bay City, LLC . . . the principal sum of Nine Million Dollars ($9,000,000) or such amount remaining outstanding ("Principal Amount"), pursuant to the provisions of this note (the "Note") and certain documents and writings executed and delivered to the Lender by the Borrower and other signatory parties (the "Loan Documents") in connection with the obligation evidenced herein (the "Loan").

8

The Court finds this argument unavailing. The choice-of-law provision in the Security Agreement did not trump the choice-of-law selection in the Note in this way. Finding otherwise would render meaningless the choice-of-law clause in the Note. Bay City was obligated to repay the $9 million pursuant to the terms of the Note, and this obligation was secured by both a Security Agreement and a Deed of Trust. The document which defines the loan and corresponding obligations is the Note. It established the interest rate, the maturity date, how payments would be applied to the loan, and a penalty for late payment. In Paragraph 21 of the Note, the parties clearly selected Ohio law to govern the Note.

The Security Agreement simply secured the obligation defined in the Note with inventory and equipment. Indeed, the first page of the Security Agreement defines the obligation by reference to the Note:

> Original principal amount: $9,000,000.00, subject to increase *in accordance with the terms of the Note*.
>
> * * *
>
> Terms of Payment: *As provided in the note*.

(Doc. No. 4, Ex. C) (emphasis added).

Bay City contests the terms of the Note, not the Security Agreement, arguing some of the terms of the Note are unenforceable. Therefore, Ohio law applies to evaluate the enforceability of the challenged portions of the Note.

9

### C.   Enforceability of $4 Million Late Payment Penalty

Having determined Ohio law applies to interpret the enforceability of the $9 million loan set forth in the Note, the Court now turns to whether the $4 million late payment penalty in Paragraph 8 of the Note is enforceable under Ohio law. Paragraph 8 provides:

> Late Payment Penalty.  Borrower is obligated to pay in full all amounts of principal and interest upon the Maturity Date.  Pursuant to other loan documents, including the Operating Agreement of Borrower, Warranty Deed with Vendor's Lien, and Security Agreement, Borrower shall pay all amounts due and owing upon closing of the Project Financing.  If Project Financing shall not be closed on or before July 15, 2007, then the amount of principal then due shall be extended to $13 Million, and the amounts due and owing shall include all expenses incurred by Lender in liquidity of assets of Borrower, including all attorneys' fees, costs of appraisal, liquidation and such other expenses as maybe [sic] incurred by Lender in such liquidation.  Priority of payment upon liquidation shall be payment of all of Lender's expenses incurred, then late payments, then interest, then extended principal of $13 Million.

Ohio law specifically prohibits a limited liability company from asserting a defense or making a claim of usury in an action or proceeding related to any obligation of that company.  R.C. § 1705.33.[1]  Therefore, Paragraph 8 of the Note cannot be voided for usury.  Bay City argues, however, that even under Ohio law, Paragraph 8 is not an enforceable liquidated damages clause, but rather constitutes unenforceable punitive damages.

Generally, parties are free to enter into contracts that contain provisions which apportion damages in the event of default. *Lake Ridge Academy v. Carney*, 66 Ohio St. 3d 376, 381 (1993). However, the Ohio Supreme Court has limited this principle, noting that "[i]n certain circumstances

---

[1] That section reads: "No domestic or foreign limited liability company and no person acting on its behalf shall interpose the defense or make the claim of usury in any action or proceeding upon or with reference to any obligation of that company. The notes, bonds, other evidences of indebtedness, mortgages, pledges, and deeds of trust of a limited liability company shall not be set aside, impaired, or adjudged invalid by reason of anything contained in any laws prohibiting or otherwise pertaining to usury or regulating interest rates."

. . . complete freedom of contract is not permitted for public policy reasons. One such circumstance is when stipulated damages constitute a penalty." *Id.* The rationale for this limitation on contract freedom is that "the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach," therefore "'[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.'" *Id.* (*quoting* Restatement (Second) of Contracts § 355 (1981)). Whether a stipulated damages provision constitutes enforceable liquidated damages or an unenforceable penalty is a question of law for the Court. *Id.* at 380.

"A punitive remedy is one that subjects the breaching party to a liability 'disproportionate to the damage which could have been anticipated from breach of contract.'" *Id.* at 381 (*quoting* 5 Williston on Contracts § 776 (3d ed. 1961)). "The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." *Id.* (internal quotations and citations omitted). Furthermore, "[a] penalty is designed to coerce performance by punishing nonperformance; its principal object is *not* compensation for the losses suffered by the nonbreaching party." *Id.* (emphasis in original).

On the other hand, clauses in contracts providing for "reasonable liquidated damages are recognized in Ohio as valid and enforceable." *Stoebermann v. Beacon Journal Publ'g Co.*, 177 Ohio App. 3d 360, 367 (2008) (internal quotations and citations omitted). Liquidated damage clauses are contracted for in advance by the parties and provide for damages to be paid in the event of a breach and are enforceable, "'as long as the provision does not disregard the principle of compensation.'" *Lake Ridge Academy*, 66 Ohio St. 3d at 381 (*quoting* Restatement 2d § 356, comment a).

11

When distinguishing between a valid clause for liquidated damages and an invalid clause for punitive damages, "'neither parties' actual intention as to its validity nor their characterization of the term as one for liquidated damages or a penalty is significant in determining whether the term is valid.'" *Id.* at 382 (*quoting* Restatement 2d § 356, comment c).  Therefore, the label of the clause as a "Late Payment *Penalty*" is not determinative here.  Rather, the Court must examine the clause in light of what the parties knew at the time the contract was formed and in light of an estimate of the actual damages caused by the breach.  *Id.*  If the damage clause "was reasonable at the time of formation and it bears a reasonable (not necessarily exact) relation to actual damages, the provision will be enforced." *Id.*

Ohio employs a three-part test to evaluate a stipulated damages provision.  The test is set forth in *Samson Sales, Inc. v. Honeywell, Inc.,* 12 Ohio St. 3d 27, syllabus ¶ 1 (1984), and was confirmed by the Supreme Court in *Lake Ridge Academy*, 66 Ohio St. 3d at 382.

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

Here, the first prong cuts both ways.  Courts have held that damages for the withholding of money are easily determinable:  interest at prevailing rates.  *See, e.g., Greentree Fin. Group v. Execute Sports, Inc.*, 163 Cal. App. 4th 495, 500 (Cal. Ct. App. 2008).  "One case in which the courts almost always agree is that, in the absence of legislation, the amount of agreed damages is a penalty and unenforceable where a sum of money is made payable upon default, in the payment of a smaller

12

sum of money, and the difference between the two sums is not merely the interest value of the smaller." 11 Corbin on Contracts § 58.13 (Rev. ed. 2005). This Court refuses to go so far as to hold that damages for withholding money always equate to prevailing interest rates because this Court recognizes that damages in such contexts can take other, less definitive, forms, such as missed opportunities to invest the money in alternative business ventures. Damages for defaulting on the $9 million loan were, to an extent, uncertain at the time the parties signed the Note. WIS-Bay's damages could take the form of lost opportunity costs, lost earnings based on the interest rate, or other secured investments.

In any event, under the second prong, the facts support a finding that Paragraph 8 constitutes a penalty. Certainly the $4 million "late payment penalty," when compared to the original $9 million loan, is severe. Paragraph 8 effectively calls for Bay City's principal to increase 44% in the event Bay City failed to timely pay, and requires a $4 million charge for the use and detention of $9 million for 72 days. It is difficult to imagine how WIS-Bay could have suffered $4 million in damages during that short time. And that is true whether a cure occurred as long as a year or two later. The flat sum payment, irrespective of the amount or length of default, can hardly be viewed as anything but "unreasonable and disproportionate" under the circumstances. *See Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 562 (7th Cir. 2001) ("The amount of damages under the agreed order also is insensitive to the magnitude of the defendants' breach. Regardless of whether the defendants were a day late in making the last payment or had refused to perform at all, they would have been required to pay $150,000 to the plaintiffs.").

Certainly it is not a fair estimate of damages. *See, e.g., id.* ($150,000 not a reasonable estimate of damages caused by late payments for underlying obligation of $250,000); *Greentree Fin. Group,*

13

163 Cal. App. 4th at 500 (finding $61,232.50 bore no reasonable relationship to breach of $20,000 payment obligation); *Quaker Oats Co. v. Reilly*, 711 N.Y.S.2d 498, 500 (N.Y. App. Div. 2000) (provision of a $355,000 promissory note secured by a mortgage which stated that the outstanding principal balance would be increased by $125,000 if the note was not repaid at maturity, imposed an unenforceable penalty because it was not a reasonable assessment of the probable and readily ascertainable damages); *Grooms v. Rice*, 429 P.2d 298, 300 (Colo. 1967) (provision in $25,000 loan contract that the $10,950 initial payment would constitute liquidated damages in event borrower defaulted on an installment payment held to be penalty). *Compare Cochran v. Schwartz*, 120 Ohio App. 3d 59, 62 (1997) (concluding a 7.25% ratio between $5,000 earnest money deposit and $69,000 purchase price of real estate was enforceable liquidated damages but such ratio was "pushing the envelope" of enforceability).

In short, the objective of the $4 million payment in Paragraph 8 of the Note is not to provide for reasonable compensation of estimated actual damages flowing from the breach of contract. Rather, the amount crosses the line of enforceability. *See Nationwide Mut. Fire Ins. Co. v. Sonitrol, Inc. of Cleveland*, 109 Ohio App. 3d 474, 486 (1996). "[W]here the amount specified is manifestly inequitable and unrealistic, courts will ordinarily regard it as a penalty." *Samson Sales*, 12 Ohio St. 3d at 28. Here, the $4 million late payment is indeed a penalty and unenforceable.

### IV. CONCLUSION

The Court finds it does have jurisdiction over Bay City's Counterclaims. Ohio law must be used to interpret the Note; and under Ohio law, the $4 million penalty in Paragraph 8 is unenforceable. For the reasons stated above, WIS-Bay's Motion for Partial Summary Judgment is granted in part and

14

denied in part, and Bay City's Motion for Partial Summary Judgment is also granted in part and denied in part.

    IT IS SO ORDERED.

                                                                   s/ *Jack Zouhary*
                                                  JACK ZOUHARY
                                                  U. S. DISTRICT JUDGE

                                                  June 12, 2009